Your Honors, may it please the Court, my name is David Green, I represent Appellant Norbert McLean in this matter. The central purpose of FOIA is to facilitate citizen oversight of the government's conduct and to hold government accountable to its citizenry. As the D.C. Circuit said in the Stern case, it's holding the governors accountable to those they govern. The central purposes of FOIA are, however, frustrated when FOIA exemptions are used to block citizen access to records pertaining to illegal, improper, and unauthorized governmental conduct. That there was illegal conduct by the government in this case is not disputed. The agencies concede that two judge advocates and one naval investigator issued 12 illegal subpoenas to civilians. Counsel, when you say illegal, you don't mean criminal, do you? They were unauthorized. There's no authorization in military courts to issue subpoenas to civilians prior to the convening of an actual court-martial. So it's not disputed that they were unauthorized and improper, and we would say illegal as well. And nor is it disputed that these subpoenas were concealed from the military court and the defense over the court's order when it granted a motion to compel. Moreover, the record is replete with evidence of a continued disregard and failure to investigate both the issuance and the concealment of these subpoenas. The Department of Defense itself characterized the Navy's communication with it regarding this matter as historically lax. Explain, you know, your client pled guilty to 12 counts of specifications of writing bad checks. I believe he pled guilty to fewer. Well, whatever. Whatever it was. And I'm sorry. So what difference does all this make? Well, the FOIA case is not about Mr. McLean's court-martial proceeding and his challenges to his guilty plea. FOIA is a requester-neutral statute. His, Mr. McLean's, status as someone who has a personal interest in the documents neither helps nor hurts his FOIA case. Well, that's part of the balancing that we have to do, isn't it, when we're considering the exemption? Not necessarily, Your Honor. I mean, you certainly can consider the gravity of the offense when you're doing a public interest balancing in terms of the Exemption 7C. But I don't think that Mr. McLean's guilty plea has any bearing on that. Which exemption are we discussing? Maybe we can put this into context. We only do a balancing in terms of Exemption 7C. We don't have a balancing in terms of Exemption 5. So we are talking about the balancing. We're talking about the – Or 5. Right. We're talking about the privacy exemption. Yes, Your Honor. I don't believe that Mr. McLean's guilty plea is relevant. I do not think that has a bearing on the public interest. The public interest here – So are you ceding the argument on 7C? Oh, no, not at all, Your Honor. Okay. No, in no way am I ceding that argument. Well, that's why I was asking you the question about the balancing. Yes. And you said that 7C does contain a balancing component, right? Yes, it does. So it's not irrelevant regarding why the information is – I don't believe that his guilty plea is relevant to – is at least not strongly relevant to the public interest assessment. You certainly can consider the history of the issuance of the – What is he trying to accomplish? By this FOIA request, he's trying to shed light on governmental misconduct, on both the issuance of the illegal subpoenas, which is not an isolated act, which as an article in Army law reported happens way too frequently and is typically condoned without any consequence. The public interest in this disclosure is fairly slight because it's not a widespread misconduct. It's a single instance of a single case that's being sought. And we would hope the court would consider that this is – there is a strong public interest in this. Well, the cases say if there's a widespread corruption or illegality, the public interest is more – is stronger than when you have an isolated incident that's being brought to light, especially when it's a personal issue that's being aired, as opposed to kind of an objective look into purported misconduct. Certainly the public interest assessment is far – is a much easier assessment when there is a broad scale of – Well, is he trying to clear his record? He's doing that as well. He's trying to do that as well, and he's pursuing that through separate court procedures. But the FOIA action is – Through separate what? Through separate procedures. He has other procedures of – Like what? Both in – he's challenged his – well, he's actually taken his challenges to his court-martials as far as he can in the military courts and has been denied access by the civilian courts. So is this action a retaliatory one? He wants to get back at this prosecutor? Oh, no, not at all. I mean, he – what – I mean, his experience in his court-martial is what exposed him to what – to this practice, this issuance of illegal subpoenas, and then issuance, the concealment, and then the government's failure to actually investigate or take any action against this illegal – Well, the government did take action. Maybe not the action that he thought was appropriate, but there was some action taken. There was – We don't know the extent of it, but there was some action taken. There was some action taken. The action was taken only after a member of Congress, the chair of the subcommittee of total force from the House Armed Services Committee, and Mr. McLean himself filed a hotline complaint with the Department of Defense, and only after the White House Counsel's Office requested that some action be taken as well. Prior to that, in the 12 years prior to that, there – what we see is a – is a continued period of disregard for this, with the Department of Defense saying that – pretextually saying, as we've seen from the documents that have been disclosed, that we can't look into this because there's ongoing litigation, describing their own – the Department of Defense and the Navy's strategy here as sitting on it so it will go away. Was the request for documents involving all court-martials or just this particular court-martial? This one was just for this court-martial. Now, FOIA does create this problem for requesters where if you do make a request that says, you know, I – like all documents regarding every illegal subpoena that was issued, your response you're likely to get back is, well, that's too overbroad, you need to narrow it some. And then when you make a narrow request and say, well, let's just start with this one case, then you get the response, well, this isn't a matter of public interest because you're only looking at this one case. This FOIA request does only pertain to the issuance of these 12 illegal subpoenas in this case. So if you got your wish, what do you do with that information? I'm sorry, Your Honor. If you got this information that you seek, what does your client do with it? Well, we're hoping that this will shed light on this practice and also – and demonstrate that neither the Navy nor the Department of Defense takes these violations very seriously. It's already been admitted. I mean, the light has already been shed because the Navy has conceded that the subpoenas were issued before the court-martial had actually convened. Yes. So the light has already been shed. We know that, and that's all we know. We don't know – we don't know any other details about their issuance or why they were missing for as many years – why these subpoenas were missing for as many years as they were missing. We don't know why they – why they failed – why they would not investigate this until they were directed to by a member of Congress in the White House Counsel's Office. We don't know why they took what is a serious offense, a defense – even the civilian who receives the subpoena of their due process rights and their rights under the Right to Financial Privacy Act – why they consider that to be a minor offense. We don't know that. And that is information that this FOIA request seeks to uncover. But what are you going to do with all this? This is, you know – I mean, why are you doing this? Again, it's – I mean, the purpose of FOIA is to shed light on – Oh, I know. I heard that story from you. Yeah. Yeah, but it seems he's not trying to clear his own record. He's not trying to get the type of discharge he received set aside or anything like that. Well, we're hopeful. Mr. McClain still has – does still have efforts to clear his name. But he's also very active in congressional efforts to reform certain military procedures. And we're – he's hoping that this information of this – he has other FOIA requests as well that are pending – will shed light on this practice and will allow reform in this area. As the Army Law article pointed out, this happens too much. This is a problem, the instance of these illegal subpoenas. And too often there's no – there is no – there is nothing one who is – nothing a court-martial defendant can do in these cases. We're hoping that this will lead to reform. Does he have anything filed with the Board for Correction of Naval Records? I don't know, Your Honor. I would have to – I could ask Mr. McClain. He is here. But I do not know, Your Honor. I mean, I think perhaps a good way of looking at this is the way the D.C. Circuit did in the Stern case when it was articulating the public interest. What the D.C. Circuit said there, and I believe this applies equally well in this case, is the public may have an interest in knowing that a government investigation itself is comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner. And I believe that is the same public interest here. What this Court said in Dabrowski is that when there is governmental wrongdoing, you can almost presume that there is a public interest in shedding light on that governmental wrongdoing. I don't believe there is anything in this case that would prevent any court or counsel against doing that same presumption here. There is something important about shedding light on governmental wrongdoing. In many of the cases that this Court has decided, there have been single incidents of wrongdoing. In Dabrowski, it was a single assistant bureau chief of the FCC, whether or not he was improperly taking sick leave. That was the issue. In that case, this Court said that was a compelling public interest that outweighed that individual. Yeah, but that was a high government official, fairly high. Well, it was an assistant bureau chief of the FCC's public, what are the FCC's subcommissions. Right. Well, that was the distinction. That was one of the reasons. The Dabrowski Court did not rely on his rank in its ruling. Dabrowski was a Rule 6, so it was an Exemption 6, so the balancing was slightly different. But the Dabrowski Court did not rely on his rank. In Castaneda, in the Castaneda case, this Court was looking at a USDA investigator, not a high-ranking official in the U.S. Department of Agriculture, but an investigator who was charged with investigating food stamp fraud. And still in that case, they found that when there were doubts about the reliability of this investigator's report, that the public had a right to his information, even though he had privacy interests. The public interest in knowing that an investigation is conducted properly was a compelling public interest. That can outweigh and often does outweigh a privacy interest. Well, I think we have your argument well in hand. I hope so, Your Honor. Yeah. You might want to save some time for rebuttal. I will. Would you like me to address the Exemption 5 argument, which we're not, again, we're not talking about this balancing there. In that case, we are, what we are inviting this Court to do is to recognize that the Deliberative Process Exemption categorically does not apply to records that reveal information of government misconduct. Counsel, just on page 280 of Dabrowski, we said that there's a relatively high-ranking FCC official. So that was one of the factors. It was one of the factors, Your Honor. Exactly. And, again, I would cross this Court against using a formalistic approach on rank. We have seen, again, in Castaneda, it was just a USDA inspector. Also noteworthy is that in one of the cases that the government cites is the Cochran case. And in that case, it was a, I think, a two-star general. But it's important to note that what Cochran relied on itself was another case, which is Columbia Packing Company v. USDA. And it was not, in my papers, 563 F. Second, 495. It's a First Circuit case from 1977. In that case, the government misconduct was inspections by meatpacking inspectors, I mean low-level meatpacking inspectors. So we've never confined the public interest assessment only to high-ranking, misconduct by high-ranking governmental officials. Certainly when there is misconduct by high-ranking governmental officials, that creates a very, very strong public interest. Well, I just mentioned that because that was one of the cases you were asking us to use as a model. And I remembered that that was a relatively high-ranking person. So it doesn't necessarily track the situation we have. I understand, Your Honor. But here the government has admitted that the subpoenas were issued illegally. Yes, they have admitted that, Your Honor. Okay. So that's an admission. So you got that. What else? Well, I mean, again, it's not just about the issuance of the subpoenas. It's about the concealment of the subpoenas. And then it's also about the efforts, how the government responds to that, how seriously it takes the issuance of the subpoenas, what consequences there are for the officials who do issue the subpoenas. But we know that as well. We know that there were some consequences. There were, Your Honor. We just don't know the details of what those consequences were. That's correct. But you're saying that the public interest supports knowing the details of that. Yeah, at least some level of detail, Your Honor. That's correct. The public interest, the public has a very strong interest in knowing if government is properly investigating its own actions. What difference does it make, the level of response, if there was some response? I mean, what's the public interest in knowing the details? Well, there was a response here, Your Honor. He was found to have done something. They characterize as a minor and technical violation. But even that, when you close a case pursuant to that regulation, they are required to do some corrective counseling. The Vaughn Index itself, two of the records in the Vaughn Index, refer to disciplinary measures that were taken against him. Right. And so we know there were some. What's the public interest in knowing the exact extent of that corrective action? Well, the public has an interest in knowing how seriously it takes its offenses and what type of discipline it does subject those officers who do engage in this misconduct. I believe that's part of the public's responsibility. Well, it's a balancing. Yes, it does. Again, it's all a balancing of the privacy. It's the privacy of the individual. And we do assert here, and I'm happy to discuss, why we believe that these officers have a very, you know, highly diminished privacy interest, personal privacy interest in this case. And we've addressed that in our papers. And again, when you get to talking about rank in that situation, what the courts have looked at is not just what the person's title and rank was, but how directly responsible they were for the misconduct. And here, had it been a court martial, Lieutenant Rosser would have been the person who could issue the subpoenas. He had that ability. That doesn't mean that you're high-ranking because you have the authority to issue subpoenas. No, we're not saying that he's an empirically high-ranking official. All we're saying is that when courts do this 7C balancing test, they don't look just at rank, at what the title was. What they look at is we look at the misconduct, and you look at the person. Was it their responsibility? The types of cases where they find very strong privacy rights are those cases where it was a low-level person who was caught up in somebody else's misconduct. There was someone else's misconduct, and they were caught up in it, and they did something inadvertently. It wasn't they were following someone else's orders or following someone else's direction, and they were not exercising their own discretion. And the Providence Journal case that we cite in our papers really talks about that very nicely. And that was the distinction also that the court made, the D.C. Circuit made in the Stern case where it said that the higher-ranking officer, that Exemption 7C did not shield records regarding the name of the higher-ranking officer, but did of the lower ones. They weren't looking merely at rank. They would look at what connection is there between the illegal conduct and the person. In this case, there was a direct connection. It was his own conduct. He wasn't following someone else's orders. You're down to one minute, 50 seconds. Okay. Can I briefly then talk about the deliberate process exemption? You've only got 20 minutes overall. Oh, I'm sorry. I thought I had reserved time for rebuttal. No, you've got 20 minutes. I'm sorry. I will save the remainder of my time on that. I'll try to help you out. No, thank you. I do appreciate that. There's been a lot of repetition. Okay. Good morning, members of the Court. May it please the Court, my name is Armando Rodriguez-Feo, and I'm representing the government in this case. And I guess before I address some of the specific things that the appellant said earlier, I'd just sort of like to invite this Court's attention to a few things about prior submissions. And really what I'm talking about is the request for the Court to take judicial notice of 1994 Washington Post articles, as well as the brief of amnesty. In terms of those articles, those articles were not in front of Chief Judge Gonzalez in the district court, but the things that essentially what Mr. McClain's attacks on federal banks and things like that for disclosure of his records we believe is really not relevant to the FOIA issue. Those are statements that he made. But one thing, there are some comments in one of those articles where Mr. McClain makes allegations that he was, you know, forced out of the Navy because of his sexual preference. So we just took judicial notice of the fact that those articles were published, not of the contents of the articles. So you might not want to. Great, Your Honor. I just wanted to make sure that because those things weren't before, I wasn't sure to the extent of the Court's ruling whether that was something that they would consider, as well as the brief of amnesty has a number of statistics and things like that that, again, were not considered by the district court below, but primarily dealing with Exemption B-5. And if I could just mention to the Court that the only one document in the Vaughn Index that strictly relies on the B-5 privilege, and that is document number 14. Every other document is covered by both, the B-7C and the B-5. So I don't want to spend a lot of time talking about the B-5 unless the Court has any specific questions on the B-5 exemption. But that document in the Vaughn Index, number 14, is a draft letter to the Judge Advocate General, which was never signed. To our minds, you can't have a document that's more deliberative in nature than a draft for a superior to sign that never goes out. So unless there are any questions on B-5, I'd like to address the B-7C exemptions. In B-7C, you apply a balancing test. And Chief Judge Gonzalez made some findings of fact in the district court below, and those findings of fact should be followed by this Court unless they are clearly erroneous. In Schiffer, in Church of Scientology, this Court has held that the factual findings should only be disturbed if they are clearly erroneous. And then the underlying exemption would be considered de novo. In this particular case, we would argue that the standard review is clearly erroneous because the exemption is so intertwined, and I want to make sure I have the exact wording that the Court has used before. Where findings of fact effectively determine the legal conclusions, the Court will employ clearly erroneous. Let's assume we don't agree with you and we are reviewing this de novo. Okay. If you are reviewing it de novo, we don't think that's going to change the conclusion as far as what we're putting forward. Because, again, first we look at the factual findings to see if they were clearly erroneous. Here we have a dispute of fact. Chief Judge Gonzalez found several things with the evidence that was presented to her. One, that Lieutenant Rosser was found not to have committed professional misconduct and the investigation was closed. Well, wait a minute. How is that on which issue, on the bar suspension or on issuing the subpoenas? What was that finding of fact related to? On the results of the ethical investigation, the professional responsibility investigation that the Navy conducted. But I don't know about that. There was something in there that said there was some discipline, wasn't there? There was, but the level of discipline did not rise to be sanctionable professional misconduct. I see. Okay. Again, so that was one of the findings of Chief Judge Gonzalez. The other finding was that he was in good standing with the Kentucky Bar when he was prosecuting the plaintiff's case. What about when he issued the subpoenas, the unauthorized subpoenas? Was he in good standing with the Kentucky Bar? He was, Your Honor. The record shows that this was in February of the year before, of that year, when he had been reinstated for a technical violation for nonpayment of dues. And, in fact, if you look at the record on plaintiff's submissions below, in the record of trial, where you have a discussion between an appellant's defense lawyer and the prosecutor, it appears the prosecutor at that point was Lieutenant Sprantz, the one that actually went to court with the case, where Mr. McClain, you know, where these arguments were presented and he ultimately pled guilty, Lieutenant William Sprantz. We argue that that would urge against the public interest finding. The other thing is the court found below that it wasn't really Lieutenant Rosser's actions, that the issue was really the appellant's attack on his court martial conviction. And I think the court alluded to that earlier, that his personal interest was really what was overarching, not the public interest at stake. Because, quite frankly, if we look at the public interest in terms of shedding light to these incidents of purported misconduct, they make a showing in their brief and even an argument, appellant states how the military commanders tacitly approve this practice of issuing illegal subpoenas. Well, I think that we've shown that this is an isolated incident, the exception rather than the rule. In our 28J notice to the court, we provided a cite to another district court case below for Judge Hayes, where the McLean appellant argued that the Air Force and the Army had a systematic problem of these unlawful subpoenas. And as it came out in discussion, really what the appellant presented were maybe six examples when this happened, out of something like 50,000 cases. And the court went on to conclude that this was not a case where you had this systemic problem of unlawful subpoenas that would have this public interest that would override the privacy interest in the professional responsibility record. We would urge the court to consider that, that we're talking about maybe six or seven examples of where this has happened. And that out of 50,000 court-martials or so, and that's an approximate number, does not show that there is this pattern, this wide net of government misconduct and concealment in permitting this, you know, rogue prosecutors to issue subpoenas. Counsel, what? I was just going to ask you, does the Navy routinely hold court-martial proceedings on Naval personnel that write checks with insufficient funds? I don't have any specific examples in front of me, but the Navy does prosecute crimes in the Uniform Code of Military Justice, be it writing bad checks, be it lying to superiors, be it drinking and driving. There's a whole many, many crimes that the military does attend to. And, yes, we believe that the writing of thousands of checks is a criminal offense and needs to be prosecuted. And so the Navy prosecuted the appellant for that. Thousands of checks or thousands of dollars? Thousands of dollars, Your Honor.  Yeah. Well, excuse me, but, you know, usually the court-martial is, you know, I mean, there are other forms of, well, you have summary court-martials, you have the captain's mast, you have all of it. Yes, sir. So how come this didn't go that way? Because the admiral, the convening authority, determined that the evidence was sufficient and the crime was serious enough to warrant a court-martial, which is a more severe tribunal. Well, that's the most severe tribunal. It is. It is. But the admiral believed that this was a serious offense that merited treatment before a general court-martial. And if I could just add something there, Your Honor, because one of the things that appellant argues is that that Lieutenant Rosser exercised this great authority and urges, you know, because he was able to issue subpoenas and had this direct impact on this case. A military prosecutor does not have the authority to convene court-martials. A military prosecutor does not have prosecutorial discretion to dismiss court-martials. A convening authority does. And that is usually a flag officer, meaning a one-star or above, or some other high-ranking officer specifically designated by the Secretary of Defense to be able to convene general court-martials. And so I think that kind of undercuts, again, the fact that Lieutenant Rosser did not have this authority and was really the one that took McLean to this court-martial. Well, do you have any idea of how many, say, in the past 10 years, how many naval officers have been brought for a court-martial for NSF? I don't, Your Honor. I don't. Very few, I would guess. I would say that perhaps it's maybe more than very few. I think that with many of these cases, one would never hear about them because they're usually with NSF cases where guilt is generally there to see, most people end up pleading guilty. And, in fact, that's what Appellant did when faced with the evidence against him, chose to plead guilty instead of arguing the fact that these subpoenas were prematurely issued. Instead of arguing that to the military court, never did, ended up pleading guilty. Never took the opportunity of his right to appeal that court-martial conviction under Article 66C to the Court of Appeals for the Armed Forces. Counsel, what's your response to opposing counsel's assertion that the fact of these unauthorized subpoenas was hidden for 12 years? Our response to that is that it's not true. There were some problems getting the subpoenas, at least at the court-martial level. It appears that the prosecutor, that Lieutenant Sprantz, couldn't find the subpoenas that Lieutenant Rosser had issued. But then, ultimately, Mr. McClain got the subpoenas. It must have been in 1994, I think, by the time he got it. When was the court-martial? 1992. So two years instead of 12 years. From the time he got his court-martials. Again, I'd have to specifically look. I'm not 100% sure on that point. But I believe that in 1994, and his papers show this in the newspaper articles, he was filing these lawsuits in the Eastern District of Virginia and all these other courts, arguing about the same thing, essentially, in quorum notice petitions before the Ninth Circuit. But that's different than actually getting the subpoenas. What's the evidence that he actually received copies of the subpoenas in 1994? I would have to check the record to make sure. That is the number that I believe it is. But I'm sure that counsel will correct me if I'm wrong. And if I go back and look at it. What's the difference between your recollection and his recollection? Because he says 12 years. You say two years. And that's a big difference in terms of whether there was cooperation or cover-up. Well, in any event, Your Honor, one of the things I'd like to point out is that the Federal Circuit, in reviewing this for statute of limitations on other grounds, and again I cited to that case in our 28J notice, Mr. McClain argued that he didn't know about any of these things until 2000 or very late. And that's why there was a delay in filing his cases before the Court of Federal Claims and all that. And that court said, based on other issues, we believe that you knew this before. So, yes, there is perhaps a disagreement on fact on that point. Well, who do you work for? I work for the Department of Justice. Because it doesn't say DOJ on our little calendar here. Sir? Well, you know, we get a little information. It just says GOV Washington, D.C. I work for the Department of Justice Civil Division. Commercial litigation branch in Washington, D.C. You could have been, I thought maybe you were a Navy JAG officer. I was a Navy JAG officer before. Yeah, but you don't have the right haircut today. One of the first things I did, judges, was let my hair grow a little bit longer. Okay. I think that I've done my best to try to address most of the Court's questions. I would just like to say one last point, and then I'll sit down and ask the Court any other questions. Mr. McLean has cast a pretty wide net in terms of government misconduct, you know, from the Department of Defense colluding with the Department of the Navy to prevent this information from coming forth, but offers really nothing, no evidence for that assertion. And courts have found below that that didn't happen. The teachings of Favish, Favish or Favish, and I don't know how exactly to pronounce it, an appellant has to present more than speculation and fishing expeditions to try to show that there was this public interest. Mr. McLean has not shown that there's this conspiracy by the departments involved to keep records from him. What has been shown is that the Navy acknowledges that the prosecutor jumped the gun in issuing these subpoenas. We've never made hidden that fact. And another thing to note is that Mr. McLean never filed a form. I'm sorry. Where's Rosser now? Rosser is out of the Navy, has been for quite some time. In fact, I doubt he's even practicing law. I think an appellant brings up in his papers that he's been suspended from the bar since 1994 in Kentucky. Counsel, what about the one document that was produced that said so much for sitting on it until it goes away or something to that effect? I think those are e-mails. I think those things are taken out of our snippets that are taken out of context. One of the things that if you look at those Department of Defense documents, now there's only four. In his brief, Mr. McLean says, we don't argue the attorney-client privilege. We don't argue the personal privacy privilege to the extent that it protects the individual's names and all that. So really what you have left, if anything, in those DOD e-mails is a couple of catchphrases here and there. One of the ones that that appellant also brings to the court is where it says, we can confidentially state to Congress that these subpoenas were issued improperly. Well, I think that's taken out of context. But the reason it's out of context is because you blacked out the rest of the stuff. So you can't have it both ways. You can't black it out and then say it's taken out of context. That's right, Your Honor. But what is that going to show? The frank discussions between the individuals involved about Mr. McLean's case, in the deliberative process, which I think is what the vast of them, those Department of Defense documents are protected under the deliberative process and attorney-client. Those discussions, what public light, we feel, is that going to show? That is the investigation. That is the discussion between officials of the Department of Defense of how they're going to handle Mr. McLean. If it showed illegal conduct, would you think that it still should be protected from disclosure? Your Honor, I think that would be a different case, but because that's not the carving out of the exemption was not something that we feel was properly argued below. But in such a case, it would have to be something that would rise to the highest levels of misconduct. You know, I think in the Stern case, they use the term intolerable, something that would show, you know, animus and a nefarious type of actions to warrants. If it shows a cover-up, you still think the deliberative process exemption should apply? Your Honor, I think cover-up is a no. First, I'll answer your question, no. But I think cover-up has a, it can be interpreted in so many ways. I mean, cover-up, if you have, in one of the cases cited by Amnesty and I think in their brief about stripping the agency of the B-5 privilege, they talk about a case, I think Tax Reform Committee, where you had officials of the White House telling the IRS to go after certain political enemies. Granted, that was a discovery case. Yes, a discovery case. In that case, they said that you could not use that privilege to sort of hide that information. But again, that was probably a very serious type of case that, one, we don't have here, and two, wasn't relating to the FOIA. I think Congress wrote the FOIA in the way that it did without the balancing test because that's how they intended. Well, actually, FOIA is intended to provide access to the documents. The overarching purpose of FOIA is to give the information. Yes, Your Honor. So the exemptions really thwart the overarching purpose of FOIA. I don't know if I would say thwart. I would say more that they also protect the government. In other words, exemptions aren't thrown out there by agencies for the purpose of thwarting, I think, public interest or confounding someone's desire to get legitimate information. It's there to protect the agencies, the agency's discussions, the agency's frank discussions, and the deliberative process privilege, attorney-client discussions, protect the personal privacy of officials. So I would use the word not necessarily thwart. I would say that the exemptions are there to protect certain aspects of the information. Are there any more questions from the Court? I will sit down. Thank you to the Court for their time, and thank you for allowing us to go first. All right. Your Honor, just a few things. Just to answer your question, Judge Rawlinson, Mr. McClain received two of the subpoenas, copies of two of the subpoenas, in 1995, did not receive the rest until between 2001 and 2002. So it was a period of he received two after three years and the rest after nine to ten years. I'm really happy that the government has conceded the point that the deliberative process exemption does not apply categorically to when those deliberations themselves reveal governmental misconduct. This Court actually must reach that issue because although the B-7 exemption was claimed for the same documents, it's for different information within the document. When you look at their Vaughan Index and we look at the documents that were produced redacted, they claim the B-7 exemption for the names on the e-mail strings, and then the B-5 for the substance. So it's not enough just for this Court to say because we find that their B-7 exemption was properly asserted, we need not reach the B-5 exemption. You must reach the B-5 exemption. It pertains to different information on the same document. I also want to clarify the Favis standard. I believe the counsel stated to be much more demanding than it actually is. What the Supreme Court said in Favis regarding the quantum of evidence that a FOIA requester must give for misconduct is that the requester must produce evidence that would warrant a belief by a reasonable person that the alleged government impropriety might have occurred. And that's it. They did not require clear evidence. Thank you, Your Honors. Thank you very much. The matter will stand submitted.
judges: Pregerson, Rawlinson, Sandoval